**FILED**

June 25, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
By: _____ DT _____
Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>(1) JOSE HUERTA,<br><br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**Case No: EP:25-CR-01547-KC**

**S E A L E D**
**I N D I C T M E N T**

**CT 1:** 18 U.S.C. §§ 1349 & 1343 –
Conspiracy to Commit Wire Fraud;
**CT 2:** 18 U.S.C. §1343- Wire Fraud
**CT 3:** 18 U.S.C. §§ 1349 & 1341 –
Conspiracy to Commit Mail Fraud;

**NOTICE OF GOVERNMENT'S
DEMAND FOR FORFEITURE**

*Notice of Government's Demand for
Forfeiture*

THE GRAND JURY CHARGES:

**COUNT ONE
CONSPIRACY TO COMMIT WIRE FRAUD**

**INTRODUCTION**

AT ALL TIMES RELEVANT TO THIS INDICTMENT:

**A.  INDIVIDUALS AND ENTITIES DESCRIBED**

1. **Long Term Acute Care Hospital:** A Long-Term Acute Care (LTAC) Hospital is a specialized hospital that provides a higher level of care than a traditional hospital for patients who need extended hospital stays due to complex medical conditions. These patients typically require intensive medical treatment, and have a lengthy recovery period, often staying for 20-30 days.  Patients are typically transferred to a long-term acute care hospital from the intensive care unit of a traditional hospital because they no longer require intensive diagnostic procedures offered by a traditional facility.

2.  "**HOSPITAL-1**," was a Long-Term Acute Care Hospital located in El Paso, Texas.

3. **"HOSPITAL-2"** was a Long-Term Acute Care specialty hospital located in El Paso, Texas.

4. Defendant, **JOSE HUERTA**, was an individual residing in El Paso, Texas, the Western District of Texas. At various separate times during the charged conduct, Defendant, **JOSE HUERTA,** was the Chief Executive Officer of **HOSPITAL-1** and **HOSPITAL-2.**

5. Defendant, who resided both in the Northern District of Texas and in Puerto Rico, was the owner of several entities related to the healthcare industry, and at various times during the charged conduct, was the Chief Executive Officer of **HOSPITAL-2.**

6. The **Marketing Company** was a marketing/medical sales company located in the Northern District of Texas and was owned by **Co-conspirator-3.**

7. **Co-conspirator-4** was an attorney located in the Northern District of Texas who, at relevant times, was legal counsel for **Co-conspirator-3**, **the Marketing Company** and **HOSPITAL -1.**

8. The **Billing Company** was a company located in the Northern District of Texas that contracted with healthcare providers to perform billing and claims services on behalf of the purported provider.

9. **Laboratory A** was a toxicology laboratory owned by, and a subsidiary of, **Laboratory A-1**, both located in the Northern District of Texas.

### B.  HEALTHCARE INSURANCE AND BILLING PROCEDURES

10**. Healthcare Provider:** Healthcare providers are individuals or organizations that render health care services to or for a patient as defined in 45 Code of Federal Regulations. The provider is the entity that treats the patient's medical condition, while the health insurer or health plan is the entity which pays or reimburses the provider for the services rendered.

11**. Healthcare Insurance**: Healthcare insurance is a contract or agreement between an individual and a health insurer.  The agreement requires the insurer to pay or reimburse the healthcare provider some or all of the healthcare provider's costs for the services provided to or for the insured patient, usually in exchange for a premium payment to the insurer.

12. **Pass Through Billing**, as the term is used in this Indictment, is an outpatient laboratory "billing scheme" that occurs when a healthcare provider, such as a physician, hospital or lab, files claims for payment or reimbursement from an insurer as though they had been the provider that actually performed the healthcare services, when they did not render the healthcare services billed. If the true rendering provider is not disclosed on the claim form, then from a billing and coding industry standard, that claim is considered a false claim.

13. **Blue Cross Blue Shield of Texas (BCBSTX) and Blue Cross Blue Shield (BCBS)** (collectively BCBS) are health insurance companies, both operating in Texas.

2

14. Neither BCBS, nor BCBSTX permit reimbursement for pass-through billing. The performing facility or ancillary provider is required to bill for the services they render unless otherwise approved.

15. The BCBSTX (and BCBS) policy regarding pass through billing in affect during the time period alleged in this Indictment stated: "BCBSTX does not permit pass-through billing, splitting all-inclusive bills, under-arrangement billing, and any billing practices where a provider or entity submits claims by or for another provider not otherwise provided for in the provider's agreement or in this policy."

16. For a BCBSTX (and BCBS) claim to be processed and for BCBSTX benefits to be valid, there must be sufficient documentation in the provider's or hospital's records to verify that the services performed were medically necessary and required the level of care billed.

### C. CLAIMS PROCESS FOR BILLING LABORATORY SERVICES

17. Providing laboratory services by a hospital laboratory is integral to the diagnosis, treatment, and ongoing care of patients in both the inpatient and outpatient settings.

18. Hospitals submit claims to payers for reimbursement for the procedures that have been rendered by the hospital for patients of that hospital. Hospitals submit these claims on a form called the UB-04, or its electronic equivalent, the Form 837, using the 837I institutional format.

19. **837I:** An 837I is the standard format institutional providers use to submit healthcare 837claims electronically to insurance companies for payment. The 837I file facilitates electronic claims submission, replacing the traditional paper claim forms. This filing includes details like patient information, treatment, services provided, cost, and adjustments. It contains all the necessary information for a healthcare claim, including patient details, diagnosis, services provided, costs, and adjustments.

20. For the purposes of using the 837I, a hospital is an institutional provider. (See CMS Medicare Billing: CMS 1450 & 837I)

21. The UB04 form, also called the CMS-1450, is the paper version of the forms 837 and 837I, and is used in manual claims submissions. The 837I is the electronic version, used by medical billers by institutions which file claims electronically.

22. **Hospital Outpatient**: Outpatient (of a hospital) means a person who is not or has not been admitted as an inpatient but who is registered in the hospital records as an outpatient and receives services directly from the hospital. (42 CFR Part 410.2) BCBS defines outpatient care as any medical treatment or service that doesn't require an overnight stay in a hospital or inpatient facility.

23. **Hospital Inpatient**: a hospital inpatient is one who is admitted to the hospital, is kept overnight (or more than 24 hours), and receives lodging and food as well as treatment.

24. **Hospital inpatient vs. hospital outpatient**: The main difference between inpatient and outpatient care lies in the length of stay in the hospital: inpatient care involves staying overnight in a hospital or facility, while outpatient care does not require an overnight stay. Outpatient care is for procedures or treatments that don't require continuous monitoring or overnight hospitalization.

25**. Non-Patient**: A non-patient means that the laboratory was referred a specimen for testing at the hospital but does not see the patient or draw the sample provided and tested (Medicare Claims Processing Manual, Chapter 16 Laboratory Services, Section 40.1 Laboratories Billing for Referred Tests).

26**. Billing Code 141** was created by the National Uniform Billing Committee (NUBC) to represent a claim for laboratory services which are provided to a non-patient. There is nothing in the definition as detailed by the NUBC or anything in industry guidance stating that the 141 type of bill code means that a reference laboratory was used to test the specimen. The patient is neither an inpatient or outpatient of the hospital and is only receiving laboratory services ordered and rendered by the hospital. Code 141 indicates a non- patient did not have their testing referred to the hospital, sent to the hospital directly, or even ordered by physicians associated with those hospital. Rather, the testing was ordered by non-hospital providers (such as individual physicians).

27. The use of Code 141 in claims submitted for payment, where testing was rendered at outside laboratories, makes multiple inaccurate representations to insurers. In such circumstances, Code 141 indicates that testing was requested by the hospital laboratories, that the patients were "non-patients" of the hospital, that the specimens were submitted to the hospital for analysis and that they were tested by the hospital laboratories.

28**. CLIA** -the Clinical Laboratory Improvement Amendments of 1988 (Title 42, USC **§** 263a), Certification of Laboratories, is a law that requires any facility performing examinations of human specimens, including urine, for diagnosis, prevention, or treatment purposes, to be certified by the Secretary of the Department of Health and Human Services. The Clinical Laboratory Improvement Amendments (CLIA) Program regulates labs testing human specimens and ensures they provide accurate, reliable, and timely patient test results no matter where the test is done.

29. A **CLIA Number** is a unique ten-character alpha-numeric code on the CLIA certificate. This number is utilized to identify and track a laboratory throughout its entire history.

30. The **Center for Medicaid Services** (CMS) issues laboratory certificates and oversees all lab testing done on humans in the U.S., regardless of whether the healthcare provider or insurer is government owned or privately owned. Upon certification, a ten-digit alphanumeric character, the unique CLIA number, gets assigned to the laboratory site.

31**. NPI (National Provider Identifier Number)**: An NPI is a unique identification number for covered health care providers, created to help send health information electronically more quickly and effectively. Covered health care providers, all health plans, and health care

clearinghouses must use NPIs in their administrative and financial transactions. The HIPAA Administrative Simplification provisions require the use of a standard, unique health identifier for each health care provider. All health care providers, including physicians, suppliers, hospitals, and others may get an NPI.

32. **Current Procedural Terminology (CPT codes)**: is a standardized coding system used to bill all medical services and procedures. The CPT descriptive terminology and associated code numbers provide the most widely accepted medical nomenclature used to report medical procedures and services for processing claims, conducting research, evaluating healthcare utilization, and developing medical guidelines and other forms of healthcare documentation. CPT codes directly affect how much a patient or insurer will pay for a given medical procedure.

33**. CPT Codes** 80305–80307, G0480–G0483, and code G0659 must be used when submitting claims for urine testing (**UDT**s) for drugs of abuse. Codes 80305–80307, G0480–G0483, and G0659 consist of two primary categories of UDT testing: presumptive and definitive.

34. **Presumptive and Definitive drug tests:  Presumptive UDTs** are used to detect the presence or absence of a drug or drug class; they do not typically indicate a specific level of drug in a patient's system, but rather give a positive or negative result. A **presumptive** drug test may be followed with a **definitive** drug test. **Definitive** drug tests are qualitative or quantitative tests used to identify specific drugs, specific drug concentrations, and associated metabolites present in human urine.

35. **Referring laboratory testing outside the hospital.** Occasionally, a hospital laboratory may receive an order for testing that it cannot render. In those cases, the hospital laboratory may enter into a reference laboratory agreement with another laboratory to render that testing.

36. **Reference Laboratory**: referred clinical diagnostic laboratory service is a service performed by one laboratory at the request of another laboratory. A "referring laboratory" is the laboratory that refers a specimen to another laboratory for testing. "Reference laboratory" is defined as the *laboratory that receives a specimen from another laboratory* and then performs one or more tests on such specimen. (CMS Manual, Pub.100-04 Medicare Claims Processing) Reference labs are used for specialized tests that are *ordered only occasionally* or that require specialized equipment for testing. In a legitimate reference lab arrangement, a hospital's lab (the referring lab) references out specimens which the hospital lab cannot process itself.   The hospital lab is the referring lab, which sends, a written order along with a portion of the sample that it had received to another laboratory. That receiving laboratory is called the "reference laboratory". The referring lab bills the payor (i.e., Medicare or private insurance) for the test and pays a fee to the reference lab that conducted the test. According to BCBS policy, a hospital can only reference out 30% of its lab tests.

37. CLIA and industry billing guidance require that the hospital disclose that the testing was rendered by another entity on both the result report and the UB-04/837I format. There are multiple ways that this is disclosed.

38**.  Accessioning services** refers to the process that occurs after a referral lab receives a laboratory order or specimen from a provider to eliminate errors by ensuring the correct

material and patient information is received along with verifying that the correct tests are ordered and performed. During the process, the specimen is prepared for lab work, that is, the specimen is unpacked, the test that is to be run on the specimen is identified, the sample is checked for contamination and is preserved properly. Technicians in pathology accessioning are responsible for the upfront handling of incoming specimens.

39. In order to determine the rate of reimbursement to a provider, healthcare insurers, including BCBS, require and rely on providers and laboratories to submit true, complete, and accurate claims for reimbursement of the healthcare services provided to the insured.

Beginning on or about 2017, and continuing to and including on or about July 20, 2020, in the Western District of Texas, the Northern District of Texas and elsewhere, the defendants,

## (1) JOSE HUERTA

combined, conspired, confederated and agreed with each other, with **Co-Conspirator-1**, **Co-Conspirator-2**, **Co-Conspirator-3**, **Co-Conspirator-4**, medical **Laboratories A** and **A-1**, the **Marketing Company,** the **Billing Company** and with other persons and entities known, but not indicted herein, and with persons, service providers and entities unknown to the Grand Jury to commit an offense and offenses against the United States, that is to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, both by affirmative acts and by deceitful concealment of material facts, that is, that over the alleged period of years, defendants and their conspirators devised and attempted to devise a scheme to engage in illegal pass through billing of Urine Drug Tests (UDTs), specifically, the defendants:

a.  through marketing efforts by co-conspirators and others, caused medical service providers, who were not located in El Paso, Texas, and whose patients were not affiliated in any manner with **HOSPITAL -1** or **HOSPITAL -2**, neither as an inpatient or outpatient, to refer UDT testing samples to **Laboratory A** and **Laboratory-A-1**;

b.  neither **Hospital-1** nor **Hospital-2** acted as a "referring laboratory," specifically, neither hospital received original orders or samples for testing UDT specimens, the billed for testing did not include urine specimens that had gone to the hospitals first, and the hospitals' laboratories did not send all or a portion of the urine specimen to an

independent laboratory to be tested; thus, the hospital did not act as a "referring laboratory;"

c.    **HOSPITAL-1** and **HOSPITAL-2** caused the claims they submitted for services provided to nonpatients to appear as if the UDT procedures had occurred at **HOSPITAL-1** or **HOSPITAL-2** by using the NPI number, Tax Identification Number, or CLIA number of the hospital to bill for testing procedures on urine samples that had not been tested by either hospital; had not been sent first to either hospital; and which samples were taken from individuals who had no relationship with either hospital;

d.    **Hospital-1** and **Hospital-2** submitted claims to insurance payors, BCBS and BCBSTX, which appeared as though the UDT samples had first been sent to **Hospital-1** or **Hospital-2** for testing, but, making it appear that the hospital could not test the samples, thus forwarded the samples for testing to a legitimate reference laboratory;

and for the purpose of executing such Scheme and Artifice to Defraud, the defendants and uncharged co-conspirators transmitted and caused the transmission by wire, in interstate and foreign commerce, writings, signs, signals, pictures and sounds, including Forms CMS 1450, 837I claims, electronic mail (e-mail) communications, cellular text messages, and text messages on an application known as "Dust," among other digital means, agreements between the conspirators, reimbursement payments, bank deposits and withdrawals, explanation of benefits statements, laboratory test results, and other documents and items relating to the collection of, testing and billing of UDT samples;

**MANNER AND MEANS OF THE CONSPIRACY and**
**SCHEME AND ARTIFICE TO DEFRAUD**

It was part of the Manner and Means of the Conspiracy and the Scheme and Artifice to Defraud that:

1. Defendants and their co-conspirators used **HOSPITAL-1** and **HOSPITAL-2** as a means or conduit vehicles to bill UDT tests unaffiliated with either hospital. Defendants had the lab tests "pass-through" their hospitals so that they could bill BCBS at a higher rate. By entering this pass-through billing scheme, **HOSPITALS 1** and **2** obtained access to a new and voluminous patient population.

2. On June 21, 2017, **HOSPITAL-2** entered into a contract with **Laboratory A-1** for **Laboratory A-1** to provide them with accessioning services.

3. On June 21, 2017, **HOSPITAL-2** entered into a contract with **Laboratory A** to provide "Screen and Confirmation Drug Testing" on behalf of **HOSPITAL-2**.

4. The contract further provided that the hospital would pay **Laboratory A** $125.00 per specimen tested, with an additional $25.00 to cover the cost of "branding requisitions" and "handling of exceptions related to obtaining necessary paperwork from referring providers."

5. On November 10, 2017, **HOSPITAL-2** amended its contract with **Laboratory A**, which agreement references the June 21, 2017 "Accessioning" contract between **HOSPITAL-2** and **Laboratory A-1,** to create a new payment schedule for toxicology lab testing.

6. On March 1, 2018, **HOSPITAL-2** amended its contract with **Laboratory A**, which amendment vacated the previous agreement, replacing it with the provisions of services for certain laboratory procedures.

7. Defendant,                                signed all of the amendments of the June 21, 2017, contract on behalf of **HOSPITAL-2.**

8. On December 29, 2017, **HOSPITAL-1** entered into a Reference Lab Agreement with **Laboratory A** for toxicology lab services.

9. On January 1, 2018, Defendant **JOSE HUERTA**, in his capacity as CEO of **HOSPITAL-1,** and **Co-Conspirator-3**, in his/her capacity as owner of the **Marketing Company,** entered into a Hospital Laboratory Management Services Agreement between **HOSPITAL-1** and the **Marketing Company**.

10. Despite the fact that an LTAC does not have "outpatients," and despite the fact that **Hospital-1** had no functioning laboratory testing equipment, in the January 1, 2018 Management Services Agreement, Defendant **JOSE HUERTA**, as CEO of **HOSPITAL-1**, represented the hospital "desir[ed] to provide laboratory services to *outpatients of* **HOSPITAL-1** ("as the term 'outpatient' is defined under federal law, 42 CFR § 401.2)" (who are not physically present at the Hospital) ('Outreach Patients')". . . . . . and would submit the testing specimens for analysis.  Under the Agreement, the **Marketing Company** would be an independent contractor who would provide "management and administration" services to the hospital. As compensation, **HOSPITAL -1** would pay the **Marketing Company** 80% of its net income for the performance of lab tests on "Outreach Patients."  The agreement named the **Billing Company** as the entity that would provide the billing services for the laboratory services allegedly provided by **HOSPITAL-1**.

11. Three days after defendant **JOSE HUERTA** signed the Management Services Agreement, on January 1, 2018, he entered into an agreement with the **Marketing Company** in which the **Marketing Company** agreed to pay the Defendant **HUERTA** 2.5% of gross collections derived from the **Marketing Company**'s agreement with **HOSPITAL-1.**

12. From January of 2018 through June of 2018, **HOSPITAL-1** and **HOSPTIAL-2** billed BCBS for UDT services for patients that had no relationship with **HOSPITAL-1**. These patients had primary care or specialty care physicians located in other areas of Texas, outside of El Paso, lived in other locations in Texas, and had received medical services in their local residential areas, but the defendants, through marketing tactics of the **Marketing Company**, caused the patients' UDTs to be billed by **HOSPITAL 1**.

13. **HOSPITAL -1** and **HOSPITAL-2** made false, inaccurate representations to BCBS on UDT claims stating the service provider was **HOSPITAL-1 or HOSPITAL-2**.

14. **HOSPITAL-1** and **HOSPITAL-2** used its Provider Financial Identification Number and NPI number on claims to BCBS indicating the respective hospital was the medical services provider.

<u>**OVERT ACTS**</u>

1. **HOSPITAL -1** and **HOSPITAL-2** listed on claims submitted to BCBS that the patient status was "Discharge to Home," when the individual listed as the patient, had not been either an inpatient or an outpatient at **HOSPITAL -1** and **HOSPITAL-2.**

2. **HOSPITAL -1** and **HOSPITAL-2** listed on claims to BCBS that the patients' status was "Self Care."

3. On or about 2018, **HOSPITAL -1,** using CLIA number 45D1050213, billed BCBSTX for the urine specimen testing of a patient, ML, an individual who resided in Sugarland, Texas, whose physician was located in Houston, Texas, and who was never an inpatient or outpatient of **HOSPITAL-1,** requesting reimbursement for testing of specimens that were drawn in Sugarland, Texas on or about February 6, March 6, March 30, and May 1, of 2018 when those specimens were never sent to **HOSPITAL-1,** but were tested by **Laboratory A** in the Northern District of Texas.

4. On January 11, 2018, BCBS patient, DE, who, was at the time of the toxicology requisition form, located in New Braunfels, Texas, provided a urine specimen for a "new patient drug screen" on a requisition form which contained the logo of **HOSPITAL-1**, however, DE had never been to El Paso, Texas and was never an inpatient or outpatient of **HOSPITAL-1**.

5. On or about 2018, **HOSPITAL-1,** using CLIA number 45D1050213, billed BCBSTX for urine specimen testing of JE, who resided in Oklahoma and was never an inpatient or outpatient of **HOSPITAL-1,** for specimens drawn on or about February 8, 2018, which specimens were actually tested by **Laboratory A** in the Northern District of Texas.

6. In or about 2018, **HOSPITAL-2**, using TIN 473055798 and NPI 1285028951, billed BCBSTX for UDT testing of patient, KV, who resided in Laredo, Texas and was never an inpatient or outpatient of **HOSPITAL-2**, for specimens drawn on or about May 21, 2018.

7. In or about 2018, **HOSPITAL-2**, using billing TIN 473055798 and billing NPI 1285028951, billed BCBSTX for UDT testing of TR, who resided in Grand Prairie, Texas and was never an inpatient or outpatient of **HOSPITAL-2,** for specimens drawn on or about July 10, 2018.

8. In or about 2018, **HOSPITAL-2**, using TIN 473055798 and NPI 1285028951, billed BCBSTX for UDT testing of patient, EE, who resided in Laredo, Texas and was never an inpatient or outpatient of **HOSPITAL-2,** for specimens drawn on or about June 27, 2018

9. In or about 2018, **HOSPITAL-2** using TIN 473055798 and NPI 1285028951, billed BCBSTX for urine testing of RC, who resided in Sachse, Texas and was never an inpatient or outpatient of HOSPITAL-2, for specimens drawn on or about May 10, 2018.

10. In or about 2018, **HOSPITAL-2**, using **Hospital-2** CLIA number **45D0873681,** billed BCBSTX for testing of PM, who resided in Georgetown, Texas and was never an inpatient or outpatient of **HOSPITAL-2**

11. On May 1, 2018, **HOSPITAL-2** became the owner of a pre-existing lab located, in Katy, Texas.

12. On May 31, 2018, **HOSPITAL-2** entered into a Management Services Agreement with **Laboratory A-1** to manage a laboratory in Denton, Texas.

13. On May 31, 2018, **HOSPITAL-1** did not have the capability to test urine samples.

14. On or about June 22, 2018, BCBSTX placed **HOSPITAL-1** on pre-payment review for all urine testing, effective June 29, 2018.

15. On or about June 22, 2018, BCBSTX notified defendant **JOSE HUERTA** they would be conducting an inspection of **HOSPITAL-1's** laboratory facilities.

16. Upon receipt of the BCBSTX notice of pre-payment review and inspection, Defendant **JOSE HUERTA,** requested that the BCBSTX inspection be postponed.

17. Immediately prior to the BCBS inspection of **HOSPITAL-1**, **Co-conspirators 1** and **3** ordered laboratory equipment to be immediately placed at **HOSPITAL-1** prior to the BCBSTX site inspection.

18. In July of 2018, Defendant, **JOSE HUERTA,** left **HOSPITAL-1** and became CEO of **HOSPITAL-2**.

19. Between January and June of 2018, **HOSPITAL-2** billed (BCBS) $1.9 million for UDT testing.

20. In July of 2018, **HOSPITAL-2's** UDT claims increased and they billed $2.1 million for services regarding testing of urine samples, more than what they had billed in the previous 6 months.

21. Between on or about January 1, 2018, and September 30, 2020, **HOSPITAL-2** billed BCBS approximately $18 million for urine testing using CPT codes 80307, G0481, and G0480.

22. Between on or about January 1, 2018, and September 30, 2020, **HOSPITAL-2** was reimbursed approximately $6 million by BCBS, ostensibly for testing urine specimens.

23. Between on or about January 1, 2018, and September 30, 2020, out of the approximately $18 million billed, over 99% were billed in 2018.

24. Between February 13, 2018, and July 6, 2021, BCBS electronically deposited approximately $10 million into two accounts owned by **HOSPITAL-1** which money was for reimbursement of claims using CPT codes G0480, 80307, and G0481. Approximately $9.8 million of that total amount was billed for these three codes.

25. Between February 2018 and September 2018, **HOSPITAL-1** paid the **Marketing Company** approximately $6.7 million dollars.

26. Between January 2018 and October 2018, **HOSPITAL-2** paid the **Marketing Company** approximately $923,000 dollars.

27. Between May 2018 and October 2018, approximately $1.1 million was transferred to Defendant,                              from the **Marketing Company's** bank account.

28. Between May 2018 and October 2018, approximately $167,000 was transferred to Defendant, **JOSE HUERTA** from the **Marketing Company**'s bank account.

29. On or about July 20, 2020, BCBS reimbursed **HOSPITAL-2** $2,430, which payment was for both presumptive and definitive lab analysis of urine samples claimed by **HOSPITAL-2** and which funds were deposited into **HOSPITAL-2's** bank account.

All acts done in violation of Title 18, United States Code, Sections 1343 and 1349.

11

## COUNT TWO
## (WIRE FRAUD and AIDING AND ABETTING)

The Introduction, Manner and Means of the Conspiracy, Scheme and Artifice to Defraud and Overt Acts alleged in Count One of this Indictment are incorporated by reference herein as if fully set out.

On or about, July 20, 2020, in the Western District of Texas, the Northern District of Texas and elsewhere, the defendants,

## (1) JOSE HUERTA

aided and abetted by each other, did devise and intend to devise a scheme and artifice to defraud and to obtain money and property from a healthcare insurer, BCBS, by means of material false and fraudulent pretenses, representations and promises, both by affirmative acts and by deceitful concealment of material facts, that is, the defendants devised and attempted to devise a scheme to engage in illegal pass through billing of Urine Drug Tests (UDT), and for the purpose of executing such Scheme and Artifice to Defraud, the defendants transmitted and caused the transmission by wire, in interstate and foreign commerce, writings, signs, signals, pictures and sounds, that is, a reimbursement payment, that on the date alleged, the defendants caused the transmission of and deposit of a BCBS payment of approximately $2,430 into **HOSPITAL-2's** bank account as reimbursement to **HOSPITAL-2** for both presumptive and definitive lab analysis UDT testing, all in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNT THREE**
**(CONSPIRACY TO COMMIT MAIL FRAUD)**

The Introduction, Manner and Means of the Conspiracy, Scheme and Artifice to Defraud and Overt Acts alleged in Count One of this Indictment are incorporated by reference herein as if fully set out.

Beginning in or about, 2017 and continuing to and including on or about July 15, 2020, in the Western District of Texas, the Northern District of Texas and elsewhere, the defendants,

**(1) JOSE HUERTA**

combined, conspired, confederated and agreed with each other, with **Co-Conspirator-1**, **Co-Conspirator-2**, **Co-Conspirator-3**, **Co-Conspirator-4**, medical **Laboratories A and A-1,** with the **Marketing Company**, the **Billing Company**) and with other persons and entities known, but not indicted herein, and with persons, service providers and entities unknown to the Grand Jury to commit an offense against the United States, that is to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, both by affirmative acts and by deceitful concealment of material facts, that is, that over a period of years, defendants and their conspirators devised and attempted to devise a scheme to engage in pass through billing, specifically the defendants:

a. through marketing efforts by co-conspirators, caused medical service providers, who were not located in El Paso, Texas, and whose patients were not affiliated in any manner with **HOSPITAL -1** or **HOSPITAL -2**, neither as an inpatient or outpatient, to refer the UDT testing samples to **Laboratory A** and **Laboratory-A-1**;

b. caused it to appear to insurance carriers, including BCBS, that the UDT testing samples had been drawn from outpatients of **HOSPITAL-1,** or **HOSPITAL-2**, both of which are located in El Paso, Texas.

13

c. caused claims for services submitted to BCBS appear as if the UDT procedures had occurred at **HOSPITAL-1** or **HOSPITAL-2** by using the NPI number, Tax Identification Number, or CLIA number of **HOSPITAL-1** or **HOSPITAL-2** to bill for testing procedures on samples that were taken from individuals who had no relationship with either hospital, among other acts;

and for the purpose of executing such scheme and artifice to defraud, the defendants and uncharged co-conspirators did send and cause to be sent and delivered, by United States mail, and by private and commercial carrier, according to the direction thereon, correspondence, explanation of benefits statements, laboratory test results, laboratory specimens and other documents and items relating to the testing and billing for laboratory services, when the defendants and co-conspirators knew the claims for the services contained misleading, false and fraudulent information, all in violation of Title 18, United States Code, Sections 1341 and 1349.

## NOTICE OF GOVERNMENT'S DEMAND FOR FORFEITURE
[*See* **Fed. R. Crim. P. 32.2**]

### I.
### Wire Fraud & Conspiracy to Commit Wire Fraud Violation and Forfeiture Statutes
[Title 18 U.S.C. §§ 1349 and 1343, subject to forfeiture pursuant to Title 18 U.S.C § 981(a)(1)(C), as made applicable to criminal forfeiture by Title 28 U.S.C. 2461(c)]

As a result of the foregoing criminal violations set forth above, the United States gives notice to Defendants **(1) JOSE HUERTA** and                                of its intent to seek the forfeiture of certain property upon conviction pursuant to FED. R. CRIM. P. 32.2 and Title 18 U.S.C. § 981(a)(1)(C), as made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c), which states:

**Title 18 U.S.C. § 981. Civil Forfeiture**
(a)(1) The following property is subject to forfeiture to the United States:
* * *
(C)  Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation . . . of this title or any offense constituting "specified

14

unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Wire Fraud is an offense constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

## II.

### Conspiracy to Commit Mail Fraud Violations and Forfeiture Statutes
**[Title 18 U.S.C. §§ 1349 and 1341, subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]**

As a result of the foregoing criminal violations set forth above, the United States of America gives notice to Defendants **(1) JOSE HUERTA** and                                         of its intent to seek the forfeiture of certain property upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c), which states the following:

**Title 18 U.S.C. § 981.  Civil Forfeiture**
**(a)(1)** The following property is subject to forfeiture to the United States:
* * *
**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Mail Fraud is an offense constituting "specified unlawful activity" as defined in section 1956(c)(7) of this title.

This Notice of Demand for Forfeiture includes but is not limited to the Money Judgment described in Paragraph III.

15

### III.
### Money Judgment

A sum of money that represents the amount of proceeds obtained, directly or indirectly, property involved in such offense, or traceable to such property as a result of the violations set forth above for which Defendants **(1) JOSE HUERTA** and                                        are individually liable.

### Substitute Assets

If any of the above-described forfeitable property, as a result of any act or omission of the

Defendants:

      a.      cannot be located upon the exercise of due diligence;
      b.      has been transferred or sold to, or deposited with, a third person;
      c.      has been placed beyond the jurisdiction of the Court;
      d.      has been substantially diminished in value; or
      e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture, pursuant to Title 21 U.S.C. § 853(p), as

incorporated by Title 28 U.S.C. § 2461(c), of any other property of said Defendants up to the value

of the forfeitable property.

A TRUE BILL.

_____
FOREPERSON OF THE GRAND JURY

JUSTIN R. SIMMONS
UNITED STATES ATTORNEY

BY: _____
Assistant U.S. Attorney

16