IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. EP-25-CR-1547-KC |
| v. | § | |
| | § | |
| (2) ISRAEL NAVARRO | § | |
| | § | |

**ISRAEL NAVARRO'S MOTION TO DISMISS THE INDICTMENT
BASED ON THE STATUTE OF LIMITATIONS**

Mr. Navarro moves to dismiss the indictment on statute-of-limitations grounds for two reasons: (1) the Government has not, and cannot, establish that "the 2020 BCBS reimbursement was for a fraudulent claim from 2018," (Court's Oct. 17, 2025 Order, dkt. 82); and (2) the Government sealed this indictment for an illegitimate purpose and unsealed it after the purported limitations deadline of July 20, 2025, and the improper sealing prejudiced Mr. Navarro and did not toll the limitations period.

As to the first reason, in its October 17, 2025 order, the Court explained that its "serious doubts about the viability of this prosecution . . . are amplified by the apparent timing of BCBS' discovery of Defendants' alleged fraudulent scheme [in 2018] and its payment of the claim in 2020." (*Id*.) In fact, the circumstances surrounding this allegedly fraudulent claim and two-years-late payment are actually far worse than what has been revealed to the Court. In the summer of 2018—at the same time that BCBSTX caused the FBI to initiate an investigation into Mesa Hills—BCBSTX sent a notice to Mesa Hills' Administrator that BCBSTX was initiating prepayment review of lab-testing claims, and it specifically instructed the hospital to "***continue submitting your claims without altering your existing process***." (Exhibit 2 – Bates-GOV-004735). Thus, even if the Government could show that the July 2020 payment related to a claim

submitted in August 2018 (something now in doubt due to the Government's Notice of Correction),[1] it simply cannot demonstrate that the Defendants did something criminal by submitting that alleged claim given that BCBSTX blessed off on the way in which Mesa Hills was submitting its claims related to the lab tests and instructed the hospital to keep doing it the same way.

Additionally, discovery from the Government reveals that it originally believed that the statute of limitations would expire *in the fall of 2023*. The FBI sent an "**URGENT**" email to BCBSTX in early 2023 about the "statute of limitation **expir[ing] in SIX MONTHS ON 9/4/2023**," (Exhibit 6 – Bates GOV-010008) (emphasis in original), and the prosecutors and case agents also had internal discussions about the statute of limitations in 2023 and 2024. Eventually, the Government indicted this case in June 2025 based on one mysterious 2020 payment that it wants the Court and Defendants to believe was for "a long-pending fraudulent claim" even though, as the Court pointed out, BCBSTX began working with the FBI in 2018. (Court's Oct. 17, 2025 Order, dkt. 82).

As to the second reason for dismissal, AUSA Kanof obtained the indictment on June 25, 2025, and moved to seal it on the same day, which the U.S. Magistrate Judge did. AUSA Kanof did not have it unsealed until July 22, 2025—two days after the statute of limitations expired. In her sealing motion, AUSA Kanof argued simply that sealing was necessary until Mr. Navarro could be arrested. This reason was illegitimate, however, and it might have been pretext for

---

[1] The Government's response to codefendant Huerta's motion to dismiss based on the statute of limitations alleged: "On August 14, 2018, a claim, number 00002018235501136B0, was submitted to BCBS for a procedure noted as both CPT Code 80307, a presumptive urine drug test, and as procedure Code G0480, a definitive urine test." (Dkt. 65 pg. 4). On October 16, 2025, the Government filed a Notice of Correction, admitting that "[t]he claim referred to in this statement was not submitted on August 14, 2018," and that "[t]he Government is actively making efforts to obtain and confirm further additional information and will supplement this Notice when more information becomes available." (Dkt. 80). Thus, Mr. Navarro has no idea whether the Government is even going forward on an allegation that he caused an allegedly fraudulent claim to be submitted on or about August 14, 2018. But for purposes of this motion, the defense assumes that it is.

another motive—to keep the indictment sealed until after she attended a meeting with Mr. Navarro's counsel scheduled for two days after the indictment, which Mr. Navarro's counsel had told her was "to demonstrate why we belie[ve] that felony criminal charges are not warranted." (6/17/25 email from Mr. McKenna to Ms. Kanof, Exhibit 10). Instead of canceling the meeting because she had just had their client indicted, she proceeded with it and got a free preview of Mr. Navarro's strongest defenses and key documents, gaining a major tactical advantage in the proceedings. To compound this egregious conduct, Ms. Kanof then asked Mr. Navarro's attorneys via email for copies of some of the documents they referred to in their presentation, and *they sent them to her* in the hope that she would read them and decide not to indict— because, again, the indictment was sealed, and she did not reveal to Mr. Navarro or his counsel that the grand jury had already charged Mr. Navarro.[2]

Given these events, AUSA Kanof improperly sealed the indictment until after the limitations period, or, alternatively, she properly sealed the indictment, but the sealing failed to toll the limitations period because Mr. Navarro was "substantive[ly] and actual[ly] prejudice[d]." *United States v. Boswell*, 109 F.4th 368, 378 (5th Cir. 2024). Under either possibility, this Court must dismiss the indictment for violation of the statute of limitations. *Id.*

For one or both of these reasons, Mr. Navarro asks that the Court grant this motion.

---

[2] At a later date, Mr. Navarro plans to file a motion to dismiss the indictment based on outrageous government conduct due to these facts.

## 1. Relevant Facts

### A. In August 2018—the same period in which it began engaging with the FBI about Mesa Hills' lab claims—BCBSTX told Mesa Hills hospital to *keep submitting claims* in the manner that it had before.

The FBI opened its investigation into Mr. Navarro's and Mr. Huerta's alleged conduct in or about August 2018. (Exhibit 1[3] - Bates GOV-003781). On August 10, 2018, Ryan Zarfoss, a member of BCBSTX's Special Investigations Division, contacted FBI Special Agent Jason Fleming and provided a summary of "what we have done corporately with respect to [El Paso LTAC, referred to in the indictment as Hospital-1]." (*Id.*). The BCBSTX investigator concluded his three-page email by stating,

> If you are interested in obtaining more information on this matter, I can guide you through the letter request process for actual claims data, contract copies, and other investigative records we have. There is a pony letter that we have which meets all HIPPA requirements and [sic] can send to you and talk you through.

(*Id.*). One week later on August 17, 2018, an FBI Supervisory Special Agent sent the BCBS investigator letters requesting records for Hospital-1 and Hospital-2, presumably using the pony letter the investigator offered to provide the previous week. (GOV-003793 through GOV-003798).

The Government has previously alleged that Defendants submitted the fraudulent claim that served as the basis for the July 2020 payment sometime in August 2018. Also in August 2018, BCBSTX sent a letter to the Administrator of Mesa Hills notifying the hospital that BCBSTX was placing claims related to certain billing codes, including lab tests, on prepayment review. (Exhibit 2 – Bates-GOV-004735). This meant that BCBSTX would review the requisite files before paying Mesa Hills for any claim submitted with those codes. (Exhibit 2). In the same

---

[3] Separately, Mr. Navarro is filing a motion to file under seal the exhibits identified herein because they either contain personal identifying information or name uncharged individuals.

letter, BCBSTX emphasized to Mesa Hills' Administrator that the hospital should "***continue submitting your claims without altering your existing process***":

> Please continue submitting your claims without altering your existing process. If BCBSTX requires additional information regarding a claim, such as the supporting medical records, you will be advised by letter. To expedite the processing of your claim, attach the notification letter including bar code with your records.

(Exhibit 2).

The letter listed the codes that the notice and instructions pertained to. They included "80307, G0481, and G0480"—codes the Government later listed in the indictment as appearing in the purportedly fraudulent claims. (Exhibit 2; dkt. 5 at pg. 11 at ¶¶ 21 & 24).

Putting Mesa Hills on prepayment review and having it continue to submit claims in the manner that it had been—rather than stopping payment and issuing a demand letter to recoup the funds BCBSTX believed were paid on allegedly fraudulent claims—was a considered decision on BCBSTX's part. In a November 2018 email, Special Agent Fleming asked SID investigator Zarfoss, "is Mesa Hills still in a pre-payment review status concerning UDT billing? or has BCBS issued a demand letter" for the amounts Mr. Zarfoss had provided to the FBI. (Exhibit 3–Bates GOV-004602). Mr. Zarfoss responded by saying that BCBSTX had sent El Paso LTAC a demand letter, but it had not yet sent one to Mesa Hills, and further explained that Mesa Hills was still on prepayment review. (*Id.*). Mr. Zarfoss continued by saying that he saw "no reason to take them [Mesa Hills] off given the circumstances" and that "BCBSTX *may take the position that the Mesa Hills lab in Denton was an entity that does not fall within the scope of the contract with the Mesa Hills hospital itself*"—indicating that a potential contract dispute was brewing but that BCBSTX had not taken that position yet (even though it had apparently already claimed to the FBI that this arrangement was fraudulent):

> We have sent El Paso LTAC a demand letter, but not one yet to Mesa Hills. Mesa Hills remains on pre-payment review, and I see no reason to take them off given the circumstances. BCBSTX may take the position that the Mesa Hills lab in Denton was an entity that does not fall within the scope of the contract with the Mesa Hills hospital itself, given that this was not a credentialed location and it was 500 miles from El Paso. I spoke to Mesa Hills' attorney a couple of weeks ago and requested some specific documents from her, but have not heard back from her since.
>
> I can continue to send you El Paso LTAC centered info, but If you want the claims data and any other detailed records regarding Mesa Hills I will need a Request For Information letter on them.

(Exhibit 3) (emphasis added).

It was not until March 13, 2020, that BCBSTX SID investigator Zarfoss sent a "Notice of Overpayment and Refund Request" to Mesa Hills' counsel. (Exhibit 4).[4] He attached to this letter the August 30, 2018 notice of prepayment review that included the instruction to "***continue submitting your claims without altering your existing process***." (Exhibit 2; Exhibit 4 at pg. 5). Perplexingly, BCBSTX then allegedly paid an August 2018 claim after that—in July 2020—and this unusual payment is the sole act that the Government claims extended the statute of limitations past 2018.

Despite the Notice of Overpayment, nothing indicates that the prepayment review was ever lifted, or that Mesa Hills, its Administrator, or Mr. Navarro were told the prepayment review was lifted and that they were supposed to disregard the instruction first provided to them in August 2018 and reiterated in March 2020 to "***continue submitting your claims without altering your existing process***." (Exhibit 2; Exhibit 4 at pg. 5).

---

[4] No Bates number is listed with this exhibit because *the Government did not provide this in discovery*, even though BCBSTX's SID investigator was "assisting" the FBI. As a result, Mr. Navarro believes BCBSTX has not provided to the Government all documents and evidence that are relevant to this case and to *his defense*. Because of this, on October 3, 2025, Mr. Navarro sent a request for records to the Government's counsel. Separately and at or near the same time, the Government uploaded on October 3, 2025, three new spreadsheets not previously provided in discovery. Further, the Government has notified Mr. Navarro that it anticipates receiving additional materials from outside counsel for BCBSTX. As a result of all of the aforementioned, on October 12, 2025, Mr. Navarro filed a Sealed Motion for Rule 17(c) Pretrial Subpoena and Memorandum. (Dkt. 75). The Court denied Mr. Navarro's request, without prejudice to refiling, due to lack of specificity. Mr. Navarro is in the process of working to modify the Rule 17(c) request.

**B.** **The Government originally believed that the statute of limitations expired in the fall of 2023, but later pointed to a mysterious July 2020 payment related to an alleged August 2018 claim to avoid dismissal.**

As part of the Government's discovery in this case, it provided copies of FBI FD-302s (302s) of interviews of witnesses. Attached as Exhibit 5 is a spreadsheet that identifies the names of the witnesses interviewed and the dates of the interviews with the list sorted by date. A review of Exhibit 5 shows that the FBI's first witness interview was conducted *six years* before the indictment was returned—on March 12, 2019. (Exhibit 5). The next interviews were not begun until August 2020, of which 12 were conducted in 2020 through November of that year. (*Id.*). Below is a chart that shows how long ago, by year, the interviews were conducted:

| Year | Number of Interviews |
|------|----------------------|
| 2019 | 1 |
| 2020 | 12 |
| 2021 | 3 |
| 2022 | 6 |
| 2023 | 2 |
| 2024 | 2 |

In addition to the FBI 302s provided, the Government also provided other reports and emails documenting its almost seven-year investigation. Included amongst those documents was a March 2, 2023 email from the FBI's Forensic Accountant to a BCBSTX SID investigative consultant, with the subject "URGENT Assistance Requested re EPLTAC and MHSH [Mesa Hills Specialty Hospital] Claims Data." (Exhibit 6 – Bates GOV-010008). In this email, the FBI's Forensic Accountant was "**URGENTLY**" asking for assistance because the "statute of limitation **expires in SIX months on 9/4/2023**":

Hi Jim,

Just wanted to update you regarding the **EPLTAC** case. Your help is **URGENTLY** needed as the statute of limitation **expires in SIX months** on **9/4/2023.**

In addition to our prior requests, can you please respond to the following:

1. Can you email me a copy of check # 12876748 (front and back); check amount $2,700.00; check date 6/26/18
2. There were eight manual checks paid to EPLTAC as listed - Check #s 12876748, 36277598, 36297693, 36297694, 36317332, 36317333, 36337076 and 36337077
3. How were these manual checks sent to EPLTAC? Were they mailed out?

I really appreciate your help in this matter.

(*Id.*) (emphasis in original).

It appears that the FBI's Forensic Accountant sent this urgent email because on or about February 28, 2023, the FBI had a conference-call meeting with AUSA Shane Romero, which included discussion about the claims submitted and paid to El Paso LTAC and Mesa Hills:

The topic of discussion include:

- VYBREM - Payments from VYBREM to Jose Huerta (EPLTAC) and Israel Navarro (MHSH)
- EPLTAC - overview of submitted and paid claims and bank deposits into UBEP 1472 from BCBS
- MHSH - overview of submitted and paid claims and bank deposits into PB 6064 from BCBS

(Exhibit 7 – Bates GOV-016849).[5]

---

[5] Exhibit 7 is a copy of the report from this February 28, 2023 meeting, which is FOA Serial 27. For some reason, the Government has redacted a significant portion of page 2 of this report that appears to be relevant to the subject at hand. Mr. Navarro is in the process of requesting an unredacted copy of the report. In the event the Government refuses to provide it, Mr. Navarro will be requesting that an unredacted copy be provided to the Court for in camera review.

**Israel Navarro's Motion to Dismiss - Page 8**

During this February 2023 meeting, they also discussed the "*[s]tatute of limitation*":

```
      Ending 1472 (Cash Depository Account)
  •   Total of all BCBS electronic deposits which include valid claims (294
      Wires): $10,120,061.28 (bank posted dates 2/13/2018 - 7/6/2021)
  •   Total BCBS deposits for UDT claims (207 Wires/8 Checks):
      $9,819,196.72 (bank posted dates 2/7/2018 - 9/4/2018)
  •   Last deposit date posted by the bank for UDT claim submitted by
      EPLTAC is 9/4/2018
  •   Statute of limitation

Flowcharts and tables were used in the meeting and attached in the 1A
section of this EC.

Investigation is ongoing.
```

(*Id.*) (emphasis added).

Yet, the investigation persisted past September 2023. On February 28, 2024, the Government appears to have had a similar meeting, this time with 13 individuals in attendance at the U.S. Attorney's Office. (Exhibit 8 – Bates GOV-016924). During this meeting, the attendees, including AUSA Romero and the case agent, discussed various topics, again including the "*statute of limitations,*" but now identifying the expiration as July 2025. (Exhibit 8) (emphasis added).

The investigation eventually resulted in the indictment handed down on June 25, 2025— almost two years after the Government originally believed the statute of limitations expired. The Government attempted to get around the statute of limitations by alleging a single payment in July 2020 for a claim allegedly submitted in *August 2018*. This was even though the Government alleged that billing for urine drug tests by El Paso LTAC (Hospital-1) and Mesa Hills (Hospital-2) ended two months earlier in *June 2018*:

> 12. From January of 2018 through June of 2018, **HOSPITAL-1** and **HOSPTIAL-2** billed BCBS for UDT services for patients that had no relationship with **HOSPITAL-1**. These patients had primary care or specialty care physicians located in other areas of Texas, outside of El Paso, lived in other locations in Texas, and had received medical services in their local residential areas, but the defendants, through marketing tactics of the **Marketing Company**, caused the patients' UDTs to be billed by **HOSPITAL 1**.

(Dkt. 5 at pg. 9 ¶ 12) (emphasis added).

However, and presumably in an attempt to save its almost seven-year-old investigation for "conduct" ending in 2018 from being time-barred due to limitations, the Government averred a single bank deposit by BCBSTX on *July 20, 2020*.

> 29. On or about July 20, 2020, BCBS reimbursed **HOSPITAL-2** $2,430, which payment was for both presumptive and definitive lab analysis of urine samples claimed by **HOSPITAL-2** and which funds were deposited into **HOSPITAL-2's** bank account.

(Dkt. 5 at pg. 11 ¶ 29). Other than this deposit by BCBSTX in July 2020, which the Government did not explain or allege that Defendants triggered, the Government averred no overt acts in the indictment after *October 2018*. (*Id*. at pgs. 9-11).

      **C.**     **Even assuming the limitations period ended on July 20, 2022, AUSA Kanof improperly sealed the indictment so that she could attend a meeting with Mr. Navarro's counsel, where, not knowing about the indictment, they presented their strongest arguments and evidence to show that Mr. Navarro should not be charged with a crime.**

In June 2025, two of Mr. Navarro's counsel reached out to Ms. Kanof to request an opportunity to explain why the Government should not charge Mr. Navarro with a crime. Specifically, on June 17, 2025, Mr. Navarro's counsel told Ms. Kanof that they wanted to meet with her on June 27, 2025 "to demonstrate why we belie[ve] that felony criminal charges are not warranted. Our presentation/discussion to you would be on those points." (6/17/25 email from

Mr. McKenna to Ms. Kanof, Exhibit 10.) On June 19, 2025, Ms. Kanof replied to Mr. Navarro's counsel with the following options:

> A.    [Mr. Navarro] may put his presentation in writing and provide it to the Government by Monday, June 23. I will treat his presentation with the protections of a proffer, that is, as long as he tells the truth, we will not use his statement against him;
>
> B.    You may make an attorney proffer in writing with the same deadline, or
>
> C.    We can participate in a TEAMS meeting, but only, on video at 10:00 a.m. – El Paso Time- Friday June 27. The meeting can be no longer than 45 minutes.

(6/19/25 email from Ms. Kanof to Mr. McKenna, Exhibit 11.)

Presented with these options, Mr. Navarro's counsel chose the TEAMS meeting on June 27. Unbeknownst to Mr. Navarro or his counsel, *two days* before that meeting, on June 25, 2025, the grand jury returned an indictment charging Mr. Navarro with three felonies. (Dkt. 5). Ms. Kanof kept this fact secret by moving to seal the indictment upon its return on June 25, 2025. (Dkt. 1 at 1; dkt. 2 at 1.) As grounds for sealing, she argued in both Mr. Navarro's and Mr. Huerta's motions:

> Neither of the Defendants named in the Indictment have been apprehended. The disclosure of the existence of the Indictment would seriously jeopardize the ability of law enforcement officers to locate the Defendant and apprehend him without incident. The Government therefore seeks an Order of the Court placing the Indictment and related documents concerning the above named Defendant in the above numbered cause under seal, until the Defendant is arrested. When the Defendant is arrested, the Indictment and related documents will be unsealed.

(Dkt. 1-2.) This reason—that the indictment needed to be kept secret so that Defendants would not flee—made no sense, as both defendants had known for months that they were the target of a federal criminal investigation and already had counsel.  Moreover, Mr. Huerta had twice spoken with the Government's agents, (GOV-0013338 and GOV-0013347), and Mr. Navarro's counsel

had met virtually with the Government on April 11, 2025—with Mr. Navarro present—where Ms. Kanof provided a reverse proffer.

On the same day that Ms. Kanof filed the sealing motion, and having not been informed of the history between Ms. Kanof, Defendants, and their counsel, the U.S. Magistrate Judge granted the motions to seal. (Dkt. 3-4.)

Knowing that the indictment was sealed and that neither Mr. Navarro nor defense counsel were aware of its existence, Ms. Kanof *kept the meeting* with Mr. Navarro's counsel on June 27, 2025, at which she knew they planned "to demonstrate why we belie[ve] that felony criminal charges are not warranted." (6/17/25 email from Mr. McKenna to Ms. Kanof, Exhibit 10.) During this Teams meeting, Ms. Kanof and other members of the Government's team listened while defense counsel presented their strongest arguments and key facts to show why Mr. Navarro should not be indicted. At no time during this meeting did Ms. Kanof, or anyone sitting with her, tell defense counsel that Mr. Navarro was already indicted.

After the meeting ended, Ms. Kanof sent a follow-up email to Mr. Navarro's counsel, with the subject "powerpoint," asking for certain documents that defense counsel had discussed in their presentation. (6/27/25 email from Ms. Kanof to Mr. McKenna, Exhibit 12.)  On July 9, 2025, Mr. Navarro's counsel provided the materials to her via email. (7/9/25 email from Mr. McKenna to Ms. Kanof, Exhibit 13.)

All this time, the indictment was still sealed, and neither Mr. Navarro nor his attorneys knew that the grand jury had charged him with three crimes just days before on June 25, 2025. Ms. Kanof did not disclose the indictment's existence until weeks later, when Mr. Navarro's counsel called her to inquire about the investigation's status on Friday, July 18, 2025. During their call, she finally told counsel that Mr. Navarro had already been indicted and that he needed

to show up in El Paso the following week for court. Despite her alleged concerns about Mr. Navarro not finding out about the indictment until he could be arrested, he was never arrested. Like most other white-collar criminal defendants, once she told his counsel that he was needed in court in a few days, he hastily planned a trip to El Paso and self-surrendered on the date directed.

AUSA Kanof did not have the indictment unsealed until July 22, 2025, the date of Mr. Navarro's initial appearance—two days after the statute of limitations expired on July 20, 2025. (7/22/25 un-numbered docket entry.)

## 2. ARGUMENT AND AUTHORITIES

### A. This Court should dismiss the indictment because the Government has repeatedly failed to allege facts demonstrating an overt act that occurred within the five years before the indictment's return.

#### i. A five-year statute of limitations applies here.

As the Supreme Court has explained, "[t]he purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. . . . Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie v. United States*, 397 U.S. 112, 114-15 (1970). Here, the grand jury returned an indictment on June 25, 2025—almost seven years after the investigation began and after the last "conduct" was alleged to have occurred in the indictment.

The charges include (1) Conspiracy to Commit Wire Fraud under 18 U.S.C. §§ 1343 and 1349;[6] (2) a substantive count of Wire Fraud and Aiding and Abetting under 18 U.S.C. §§ 1343 and 2; and (3) Conspiracy to Commit Mail Fraud under 18 U.S.C. §§ 1341 and 1349. (Dkt. 5). Each of these charges are subject to the general five-year statute of limitations found in 18 U.S.C. § 3282(a). That section provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282(a).

There is no Fifth Circuit Pattern Jury Instruction for § 1349 conspiracy; however, it is well settled that, to convict, "the Government must prove that: (1) two or more persons made an agreement to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, i.e., with specific intent." *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015) (citing *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). The same elements apply to a § 1349 mail-fraud conspiracy. And the substantive count of wire fraud requires the Government to prove specific intent to defraud. *United States v. Sanders*, 952 F.3d 263, 277 (5th Cir. 2020); *see* Fifth Circuit Pattern Jury Instruction 2.57 (requiring the Government to prove a "specific intent to defraud" and defining that as "a conscious, knowing intent to deceive and cheat someone").

In order for the indictment not to be time-barred for statute of limitations, the indictment "must show the existence of the conspiracy within the five years prior to" its return and "must

---

[6] Section 1349 provides:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

allege and prove the commission of at least ***one overt act by one of the conspirators*** within that period in furtherance of the conspiratorial agreement." *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976) (emphasis added) (vacating conviction for conspiracy because the conspiracy was completed five years before indictment); *United States v. Ongaga*, 820 F.3d 152, 159-61 (5th Cir. 2016) (citing *Davis* and vacating convictions of two defendants in marriage-fraud conspiracy case). In other words, in determining the limitations period for a conspiracy offense, "[t]he crucial question . . . is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Gruenwald v. United States*, 353 U.S. 391, 397 (1957).

        **ii.**        **The Government cannot establish that the purported August 2018 claim was fraudulent or that Defendants knew it was fraudulent because BCBSTX told them to "continue submitting your claims without altering your existing process."**

As the facts demonstrate, in 2018, BCBSTX:

(a) notified the FBI of allegedly fraudulent claims from Mesa Hills regarding lab tests and coached it on how to obtain purportedly pertinent records from BCBSTX, (Exhibit 1);

(b) told Mesa Hills' Administrator to "*continue submitting your claims without altering your existing process*," (Exhibit 2); and

(c) told the FBI that it was not sending a demand letter to Mesa Hills yet because BCBSTX was not sure whether Mesa Hills' lab-test claims breached BCBSTX's contract with them. (Exhibit 3) ("BCBSTX *may take the position* that the Mesa Hills lab in Denton was an entity that *does not fall within the scope of the contract* with the Mesa Hills hospital itself" (emphasis added)).

In the midst of these contradictory acts by BCBSTX, the Government has alleged that Defendants caused an August 2018 claim to be submitted and wants this Court to believe it was fraudulent. But the Government has not alleged any facts to demonstrate that it was fraudulent, that Defendants knew or thought it was incorrect in any way, or even that Defendants caused the claim to be submitted at all. And even assuming Defendants did cause the claim to be submitted, at this point in time, BCBSTX had not even arrived at the conclusion that Mesa Hills' lab-test claims were in breach of BCBSTX's contract with that hospital, let alone fraudulent in a criminal sense. Finally, in August 2018, BCBSTX instructed the Mesa Hills Administrator to continue submitting lab-test claims in the same manner that it had before, and it reiterated that in March 2020 by attaching that same letter to a refund request to Mesa Hills. The Government's case falls apart because it was held together by imaginary string—including the Government's reliance on a claim that the Government now says may not have been submitted in August 2018, and its reliance on a mysterious July 2020 payment.

iii.     **The 2020 payment was not in furtherance of any conspiracy or a part of a scheme to defraud.**

Additionally, even assuming the Defendants intentionally caused the submission of a fraudulent claim to BCBSTX in August 2018 (which they did not), the only reason the Government has come forward with as to why BCBSTX paid on the claim in July 2020 is that there was an "adjustment to a previously considered claim." (Dkt. 65-2 at pg. 2). Some internal adjustment to BCBSTX's claims process, made two years after the claim was allegedly submitted, is not an overt act by a conspirator, and it is not something that Defendants would have done in furtherance of the alleged conspiracy. In fact, neither Defendant could have reasonably foreseen that money from BCBSTX would drop out of the sky almost two years after BCBSTX first reported Mesa Hills' billing to the FBI and after the date of the claim's

submission and denial on August 23, 2018 and August 24, 2018. (Exhibit 9 – Bates GOV-004662). For this additional reason, the Court should grant the motion to dismiss.

**B. AUSA Kanof lacked a legitimate purpose for sealing the indictment, so it did not toll the statute of limitations; alternatively, even if the indictment was properly sealed, the statute of limitations was not tolled because Mr. Navarro suffered "substantive and actual prejudice."**

Finally, AUSA Kanof moved to seal the indictment on June 25, 2025, claiming that, if Mr. Navarro (or Mr. Huerta) knew of the charges, it "would seriously jeopardize the ability of law enforcement officers to locate the Defendant and apprehend him without incident." (Dkt. 1-2.) In fact, the facts belie this claim. Mr. Navarro learned six months before, in January 2025, that he was the target of a Government investigation—and during that time, he never exhibited any conduct that would suggest he would flee if he were actually charged. Rather, through his attorneys, he kept in contact with the U.S. Attorneys Office, even appearing virtually for AUSA Kanof's reverse proffer in April 2025. This communication continued in the days immediately before and after the indictment, when his attorneys were emailing with AUSA Kanof to plan a meeting at which they would "demonstrate why we belie[ve] that felony criminal charges are not warranted." (6/17/25 email from Mr. McKenna to Ms. Kanof, Exhibit 10.)

Given this history with Mr. Navarro and his attorneys, AUSA Kanof could have sent them a copy of the indictment and had Mr. Navarro self-surrender, as most white-collar defendants do. In fact, contrary to the claims in AUSA Kanof's motion to seal—that Mr. Navarro must be arrested before the indictment would be unsealed—he was never arrested. On July 18, 2025, Mr. Navarro's counsel called AUSA Kanof to see whether she had made a decision on pursuing charges. It was during that phone call that AUSA Kanof finally revealed that Mr. Navarro had already been indicted and needed to appear in court early the next week. Mr.

Navarro and his counsel scrambled to make travel plans to appear in El Paso, and they showed up on the appointed date for his initial appearance.

These facts demonstrate that AUSA Kanof did not, in fact, fear that Mr. Navarro would flee if he knew about the charges; rather, it is possible that one motive she had for sealing the indictment—or, at least, keeping it sealed so long—was to glean information and documents from Mr. Navarro's counsel under the guise of allowing them to make their case for why Mr. Navarro should not be charged. This included not only the June 27, 2025 virtual meeting with them, but also her request after the meeting that they send her some of the documents they discussed during the meeting. It was only after she got everything she could from them that she told Mr. Navarro's counsel about the indictment and demanded that Mr. Navarro show up for court a few days later. When she finally unsealed the indictment on July 22, 2025, the day of his initial appearance, it was two days past the limitations period that the Government contends applies.

Under Fifth Circuit precedent, AUSA Kanof improperly sealed the indictment, and the sealing therefore did not toll the statute of limitations. *See United States v. Boswell*, 109 F.4th 368, 379 (2024) (citing *United States v. Sharpe*, 995 F.2d 49 (5th Cir. 1993)). In *Boswell*, the Fifth Circuit reasoned that "(1) an improperly sealed indictment does not toll the statute of limitations; and (2) even a properly sealed indictment will not toll the statute of limitations if the defendant can show substantive and actual prejudice." *Id*. In answering the first question, a "court []must consider whether the indictment was sealed for any legitimate prosecutorial objective or where the public interest required it." *Id*. Here, the Government's proffered reason in its motion to seal—that Mr. Navarro should not learn of the charges until after his arrest,

suggesting he was a flight risk—was illegitimate. *See id*. (discussing *United States v. Gigante*, 436 F. Supp. 2d 647 (S.D.N.Y. 2006)).

As the *Boswell* court reasoned in discussing *Gigante*, that "court was not persuaded by the Government's arguments that it needed to maintain secrecy or avoid a flight risk. The defendant was well aware that the Government was investigating him, and there was no indication that the defendant would flee or be difficult to track." *Id*. (quoting *Gigante*, 436 F. Supp. 2d at 657). The same points apply to Mr. Navarro, which is why, in the end, AUSA Kanof told Mr. Navarro's counsel about the charges when counsel called her on July 18, 2025 to check the investigation's status, and she asked counsel to have Mr. Navarro appear for court a few days later.

As in *Boswell* and *Gigante*, the Government's real motive for sealing the indictment could have been something different: AUSA Kanof might not have wanted to spoil her opportunity to learn all about Mr. Navarro's potential defenses and key evidence at the June 27, 2025 meeting, scheduled for two days after indictment. She also might not have wanted to spoil her opportunity to get supporting documents from them, which she received on July 9, 2025. If this were her reason, it was patently improper, and—regardless—her proffered reason to the U.S. Magistrate Judge for sealing the indictment was illegitimate and did not justify sealing the indictment.

Even if the Government could show that the sealing was proper, Mr. Navarro can easily demonstrate "substantive and actual prejudice." First, he suffered prejudice because the sealing allowed AUSA Kanof to take advantage of his attorneys and learn information about his defenses and evidence that she was not entitled to know. Mr. Navarro's counsel never would have attended that meeting if AUSA Kanof had told them in advance that Mr. Navarro was

already indicted. By keeping that fact from them, she, in essence, tricked them into attending that meeting and thereby gained a tactical advantage. Now, the Government cannot "unring that bell"—it knows what Mr. Navarro's defenses and evidence are, and has since June 27.

Second, Mr. Navarro experienced prejudice because every day that the indictment was sealed was a day he and his attorneys could not contact potential witnesses, review Government discovery, and otherwise prepare their case. With the investigation being seven years old at the time of indictment, and witnesses moving about the country, documents and other records becoming lost, and memories fading, every day mattered. AUSA Kanof's actions robbed Mr. Navarro (and Mr. Huerta) of 27 days—almost a full month—of preparation. And this included two days that were past the limitations period. Thus, under either analysis—whether the sealing was improper or whether it was proper but Mr. Navarro was prejudiced—the Government's sealed indictment failed to extend the limitations period, and Mr. Navarro is entitled to dismissal.

\* \* \*

In sum, the Government believed the statute of limitations expired in the fall of 2023. This makes sense, because the Government alleges that the purportedly fraudulent conduct occurred in 2018. At some later date, the Government suddenly began relying on one incredibly unusual payment from BCBSTX made in July 2020, which followed *by almost two years* the allegedly fraudulent claim the Government contended (until its Notice of Correction) that the Defendants submitted on August 14, 2018. Despite multiple chances—in the indictment, its response to Mr. Huerta's motion to dismiss, and its Bill of Particulars—the Government has failed to explain (a) how either Mr. Navarro or Mr. Huerta caused that payment, (b) how the payment was fraudulent, or (c) how it could have been foreseeable to them or an overt act in

furtherance of a conspiracy that a claim allegedly submitted in August 2018 would be paid after a "readjustment" in July 2020.

Additionally, AUSA Kanof did not unseal the indictment until after the limitations period, and the sealing was improper and also severely prejudiced Mr. Navarro. Therefore, for one or both of these reasons, this Court should dismiss the indictment on statute-of-limitations grounds.

Respectfully submitted,

/s/*Leigha Simonton*
Leigha Simonton
Texas Bar No. 24033193
LSimonton@Dykema.com

*/s/ Tiffany H. Eggers*
Tiffany H. Eggers
Florida Bar No. 0193968
TEggers@dykema.com

**DYKEMA GOSSETT, PLLC**
Comerica Bank Building
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

*/s/ Ryan Downton*
**Ryan Downton**
Texas Bar No. 24036500
ryan@thetexastrialgroup.com
193 Dorado Beach East
Dorado, PR 00646
Telephone: 512-680-7947

**ATTORNEYS FOR DEFENDANT
ISRAEL NAVARRO**

**CERTIFICATE OF SERVICE**

I certify that on the 18th day of October 2025, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the below

counsel. Separately, the exhibits cited herein will be filed under seal, and provided to counsel via

email.

| | |
|---|---|
| Shane Romero<br>Assistant U.S. Attorney<br>U.S. Attorney's Office - WDTX<br>700 E. San Antonio Street, Suite 200<br>El Paso, Texas 79901 | Elyse Schneider & Erik Anthony Hanshew<br>Federal Public Defender<br>700 E. San Antonio Ave., D-401<br>El Paso, Texas 79901 |

*/s/ Tiffany H. Eggers*
Tiffany H. Eggers